UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                           Plaintiff,

            v.

DANIAL E. WIDNER,

                           Defendant.

_____

REPORT & RECOMMENDATION

09-CR-6225L

## PRELIMINARY STATEMENT

            By Order of Hon. David G. Larimer, United States District Judge, dated

December 3, 2009, all pretrial matters in the above-captioned case have been referred to this

Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 9).

            Defendant Danial E. Widner ("Widner") is charged in a single-count indictment

with possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and

2252A(b)(2).  (Docket # 8).  Currently pending before this Court are motions by Widner to

suppress evidence seized from his residence and a post-arrest statement he made to a New York

State Police investigator.  (Docket # 16).  The government opposes Widner's motions.  (Docket

# 14).[1]

            The following constitutes this Court's report and recommendation with respect to

Widner's motions.

_____

[1]  Widner's omnibus motion also sought, *inter alia*, *Brady* material, discovery and inspection, rulings on
evidentiary matters under Rule 404 of the Federal Rules of Evidence and *Jencks* material.  (Docket # 16).  Each of
these requests was either resolved by the parties or decided in open court by the undersigned on March 3, 2010.
(Docket # 22).  In addition, Widner initially argued that his Sixth Amendment right to counsel had been violated
(Docket # 23), but later withdrew that claim.  (Docket # 24 at 46).

**FACTUAL BACKGROUND**

On June 2, 2009, New York State Police Investigator Tracy Cass ("Cass") executed a search warrant at 31 Malvern Street in Rochester, New York, Widner's residence at the time. (*See* Docket # 16, Ex. B). Widner was arrested on July 22, 2009, on state charges of possession of material depicting obscene sexual performances by children. (Tr. 12-17; G. Exs. 4 and 4A).[2] Following that arrest, Widner allegedly made a statement to Cass that he now seeks to suppress. (Docket # 16 at 9, Ex. B).

On April 6, 2010, an evidentiary hearing was held in connection with Widner's suppression motions. (Docket # 24). The government called Cass to testify; no witnesses were called by the defense.

At the time of the hearing, Cass had been employed with the New York State Police for over nineteen years, the last seven and one-half years as an investigator. (Tr. 4). Her duties include investigating crimes against children, such as child pornography and sex offenses. (Tr. 4-5).

On May 21, 2009, Cass commenced an investigation of Widner, prompted by a telephone call from an employee of the Jefferson Middle School in the Rochester City School District. (Tr. 5). The employee alleged that a middle-aged, white male known as "Dan" had been seen in the company of several female middle school students. (Tr. 5, 18).[3] The caller expressed concern about Widner's relationships with the girls. (Tr. 5).

---

[2] The transcript of the April 6, 2010 evidentiary hearing (Docket # 24) will be referred to herein as "Tr."

[3] For the purpose of these motions, there is no dispute that the man identified as "Dan" is Widner.

Following the telephone conversation, Cass decided to arrange interviews of the female students. (Tr. 18). Cass testified that she wanted the students' interviews to occur simultaneously in order to prevent them from talking to one another or to Widner before all of the interviews could be completed. (Tr. 21). Cass thereafter obtained permission from the school district for the interviews and arranged for five State Police investigators to be available on June 2, 2009. (Tr. 5, 21).

The interviews occurred as arranged on June 2, 2009 and concluded at approximately 2:00 p.m. Immediately after they ended, Cass prepared an application for a warrant to search Widner's home for, *inter alia*, any computers or media containing child pornography. (Tr. 7, 22). Cass testified that she arrived at the chambers of Monroe County Court Judge Frank Geraci at approximately 3:45 p.m. in order to present the application. (Tr. 30). Judge Geraci issued the search warrant at 4:32 p.m., and the search team arrived at Widner's residence to execute it just before 5:00 p.m.[4] (Tr. 7, 10, 30; G. Ex. 1).

The search warrant included the following provision:

> You are hereby directed to take reasonable measures to limit the necessary seizure of computer hardware and/or software from the premises by conducting onsite previews of the computers and digital media located or found therein. Should evidence or contraband of the type sought be discovered during the onsite examination of the digital media or devices, or when and where this onsite preview procedure is not possible, [y]ou are hereby authorized to remove such seized computer hardware and/or software from the premises and subsequently have same processed by a qualified computer specialist in a laboratory setting.

---

[4] No testimony was elicited as to the number or identities of other law enforcement officers who assisted in the warrant's execution.

(G. Ex. 1 at ¶ 2(C)(3)). That provision had been included by Cass in the proposed warrant that she presented to Judge Geraci. (Tr. 7-8, 23, 29).

Cass testified that prior to executing the warrant for Widner's residence, she had participated in the execution of approximately fifteen to twenty similar warrants authorizing searches for computer or electronic media. (Tr. 29). In her experience with those other warrants, the executing search team "typically" included a forensic expert from the New York State Police Computer Crimes Unit, whose role was to conduct onsite forensic previews of the media. (Tr. 8). Cass testified that on some occasions a forensic expert was not available to accompany the search team and the warrant was executed without an examiner present. (Tr. 29). The examiners' usual work hours were 8:00 a.m. to 4:00 p.m. (Tr. 31). Cass's usual practice was to wait until a search warrant was signed before contacting a forensic expert because reviewing judges sometimes "turn[ed] back warrants." (Tr. 24-26).

When the warrant for Widner's residence was executed, no forensic expert accompanied the search team. (Tr. 8-9). Cass explained that after Judge Geraci signed the warrant at 4:32 p.m., she called the Computer Crimes Unit, located in Canandaigua, New York[5] and spoke with Investigator Keith Becker ("Becker"). (Tr. 8). Becker advised Cass that he was the only examiner in the office, was leaving for the day and could not accompany the search team and that no other examiner was available. (Tr. 9). Cass decided to proceed with the warrant's execution because of her concern that any delay would increase the risk that Widner would learn about the students' interviews earlier that day and destroy evidence. (*Id*.).

---

[5]  This Court takes judicial notice that Canandaigua, New York is approximately thirty miles from Rochester, New York.  Fed. R. Evid. 201(b).  A popular mapping internet site estimates the distance to be 29.86 miles.  *See* http://www.mapquest.com (last visited August 20, 2010).

Cass testified that when the search team arrived, they discovered that the conditions inside Widner's residence were "unbearable," resulting from the presence throughout the house of numerous cats and kittens, cat litter, cat feces and urine, food, bodily fluids and "other unidentifiable items," as well as a strong smell of ammonia. (Tr. 10). According to Cass, "[i]t was not an area we wanted to stay in any longer than we had to be there." (*Id.*). The team completed the warrant's execution and left the residence by 6:00 p.m. (*Id.*).

The team located and removed from the premises five computers, over forty compact discs, two thumb drives, a digital camera and a scanner – none of which were subjected to an onsite forensic preview.[6] (Tr. 9). Cass testified that given the substantial "volume of material seized" from the residence, an onsite preview of the evidence would not have been possible even had an examiner been present. (*Id.*). Cass transported the seized evidence to the New York State Police barracks on Scottsville Road in Henrietta, New York, where she tagged and logged the material into the evidence locker. (Tr. 10-11).

Sometime after the warrant's execution, the seized material was transferred to the Computer Crimes Unit in Canandaigua, where Investigator Becker conducted a forensic preview of it. (Tr. 11). On July 21, 2009, Becker informed Cass that child pornography had been found on one of the items seized from Widner's residence. (Tr. 11-12). A decision was made to arrest Widner. (Tr. 12).

The following day, Cass and two other New York State Police officers arrested Widner at his place of employment in Webster, New York. (Tr. 12). New York State Trooper Rivizvar advised Widner of his *Miranda* rights. (Tr. 13). Widner responded that "he wanted a

---

[6] According to Cass, she herself was not qualified or trained to conduct onsite forensic previews. (Tr. 8).

lawyer, but he didn't have the money to afford one." (*Id.*).  Cass and Rivizvar then transported Widner to the Scottsville Road barracks.  During the ride, neither Cass nor Rivizvar spoke to Widner, and Widner made no statements to them.  (Tr. 13-14, 36).

After they arrived at the barracks, Cass prepared the felony complaints against Widner and completed an incident report.  (Tr. 14).  Meanwhile, Rivizvar escorted Widner to the patrol room where he was processed.  (*Id.*).  After Cass finished her paperwork, she went to the patrol room to prepare to transport Widner downtown to be lodged in jail overnight pending arraignment the following morning.  (Tr. 14, 36-39).  As they were preparing to leave, Cass informed Widner of the charges against him.  (Tr. 14, 41).  She then asked him if he had any questions.  (*Id.*).  Widner replied, "Where did they find it?" and Cass responded, "I didn't find it, the computer analyst found it."  (Tr. 15).  Widner did not ask any other questions, and Cass did not say anything more to him.  (Tr. 15-16).  Cass testified that in her experience, arrestees "[g]enerally . . . have questions about when they're going to see a judge, . . . how much the bail is going to be, if they can have a phone call, things of that nature if they're unfamiliar with the arrest process."  (Tr. 15).


**DISCUSSION**

Widner seeks to suppress all of the evidence seized from his residence on the grounds that the search violated the terms of the warrant because no onsite forensic preview of the media was conducted.  (Docket # 16 at 5-6; # 26 at 1-8).  Widner also seeks to suppress his statement, "Where did they find it?" on the grounds that it was unlawfully elicited after he had invoked his Fifth Amendment right to counsel.  (Docket # 15 at 8-11; # 26 at 9-11).  The government opposes both motions.  (Docket ## 17, 28).

## I.  Motion to Suppress Physical Evidence

### A.  Overview

Widner urges this Court to apply the "blanket suppression doctrine" to suppress the evidence seized from his residence on the basis that the search was conducted in "flagrant disregard" of the warrant's requirement that an onsite preview be conducted.  (Docket # 26 at 8).  Widner notes that when the preview was conducted several weeks later, only one item of the five computers, forty compact disks and other items seized was determined to contain alleged child pornography.[7]  (*Id*. at 6-7).  In Widner's estimation, this fact, coupled with Cass's alleged "disdain" for the onsite preview provision, demonstrates that the search team conducted an illegal "general" search, warranting suppression of all the evidence, including the incriminating evidence.  (*Id*. at 7-8).

The government contends that the warrant was satisfied because (1) Cass took reasonable measures to comply with the onsite preview requirement; and (2) an onsite preview was not possible as a result of the volume of the material at issue and the unsanitary conditions of the residence.  (Docket # 28 at 2-3).  The government further argues that blanket suppression is, in any event, too harsh a remedy for the purported violation because "the images of child pornography would have been discovered regardless of whether the forensic preview was conducted at defendant's residence or in a laboratory."  (*Id*.).

Widner's motion raises the question of whether Cass complied with the onsite preview provision and, if she did not, whether suppression is the appropriate remedy or sanction.  As set forth above, the search warrant provided:

---

[7]  The specific "item" was not identified at the hearing.  (*See* Tr. 12).

You are hereby directed to take *reasonable measures* to limit the necessary seizure of computer hardware and/or software from the premises *by conducting* onsite previews of the computers and digital media located or found therein. Should evidence or contraband of the type sought be discovered during the onsite examination of the digital media or devices, or *when and where this onsite preview procedure is not possible*, [y]ou are hereby authorized to remove such seized computer hardware and/or software from the premises and subsequently have same processed by a qualified computer specialist in a laboratory setting.

(G. Ex. 1 at ¶ 2(C)(3)) (emphasis added).

## B. Did Cass Comply with the Onsite Preview Provision?

I turn first to an evaluation of Cass's attempt to comply with the onsite preview provision. Cass testified that she had included the provision in the proposed warrant that she presented to Judge Geraci; she was thus aware that she would need the assistance of a forensic examiner if Judge Geraci issued the requested warrant. From her experience, she also knew that the usual work hours for forensic examiners in the Computer Crimes Unit were 8:00 a.m. to 4:00 p.m., although she knew that some examiners had worked later on certain occasions. Although she did not begin to draft the application for the Widner warrant until approximately 2:00 p.m., she did not contact the Computer Crimes Unit before presenting the application to Judge Geraci, even though she planned to execute the warrant promptly upon its issuance.

Cass presented the search warrant application to Judge Geraci's chambers at approximately 3:45 p.m. Although the end of the work day was quickly approaching, Cass still did not contact the Computer Crimes Unit to arrange for a computer expert to be on standby. Cass testified that it was her regular practice to wait until after the warrant was signed because she had known judges to "turn back" warrants. In this case, Cass adhered to her usual practice and called the Computer Crimes Unit after Judge Geraci signed the warrant at 4:32 p.m. She

spoke to the one examiner in the office, who advised that neither he nor any other examiner was available to assist in the execution. Cass made no further attempts to secure an examiner before executing the warrant.

   The first issue to determine in evaluating Cass's conduct is the standard by which it is to be judged – an issue that necessarily begins with the language of the warrant itself. The warrant directed the executing agent to take "reasonable measures" to limit the seizure of computer hardware and software material from the residence "by conducting onsite previews of the computers and digital media located or found therein." (G. Ex. 1 at ¶ 3). I read this provision to reflect the issuing judge's determination that an onsite preview was a "reasonable measure" to undertake in order to limit the unnecessary removal of computer material. I do not read it to grant the executing agent the discretion to forego an onsite preview if she determined it would be unreasonable or impractical. Rather, the only condition placed on the requirement is found in the next sentence, which authorized the executing agent to remove the material from the premises "when and where th[e] onsite preview procedure is not possible" in order to conduct an offsite review by a forensic examiner in a laboratory setting. (*Id.*). In other words, although the language of the provision is not entirely unambiguous, I read it to permit the executing agent to dispense with an onsite preview only where its performance would be impossible, rather than simply unreasonable.

   Judged by this standard, the record does not support a finding that an onsite preview would have been impossible.[8] The sheer volume of the material, without more, surely

---

[8] Because I find that the standard is one of impossibility rather than unreasonableness or impracticality, I do not address the reasonableness of Cass's attempts to comply with the provision through her call to the Computer Crimes Unit.

does not render an onsite preview impossible, although it may make it more time-consuming and/or require the assistance of more than one examiner. Whether the condition of Widner's residence made the preview "impossible" is a closer question. I do not believe, however, that the record as it has been developed supports that finding. Very little testimony was adduced on this subject, and none was elicited as to the perceived health risks, if any, posed by the conditions of the residence. In addition, no testimony was presented concerning the condition of the unattached garage – which was part of the premises authorized to be searched – and whether the previews could have been conducted in the garage.

### C. **Is Suppression Justified?**

Having found that the search team failed to comply with the onsite preview provision, I must now determine whether suppression is the appropriate remedy. As an initial matter, I note that the warrant's onsite preview provision is not an integral element to the probable cause supporting the warrant; in other words, the application demonstrated adequate probable cause for the warrant, whether or not its terms included an onsite preview provision. Indeed, Widner does not contest that the application demonstrated sufficient probable cause to believe that computers and electronic media in Widner's residence would contain evidence of child pornography, including "[v]isual depictions or other computer graphic files, which depict children engaged in sexual conduct" and computer hardware and software used to store or transmit such images. (*See* G. Ex. 1).

Widner does assert, however, that the onsite preview provision is necessary to satisfy the warrant's particularity requirement. I disagree. Whether or not that provision was included, the warrant adequately identified those items that the search team was authorized to search for and seize – namely, depictions of children engaged in sexual conduct contained in

electronic or paper format and computer hardware and software used to store and transmit those images. The onsite preview requirement thus did not serve to transform an illegally overbroad warrant into a sufficiently particularized warrant.

Rather, the onsite preview provision constitutes a court-ordered direction as to search methodology. Courts consistently recognize that warrants authorizing the search and seizure of computer evidence present difficult issues arising from their unique capacity to hold substantial volumes of information, personal and business alike, spanning a significant period of time and ranging from innocuous to embarrassing or sensitive to incriminating. *See*, *e.g.*, *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir.) ("[t]he modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important"), *cert. denied*, 130 S. Ct. 330 (2009); *United States v. Cioffi*, 668 F. Supp. 2d 385, 392 (E.D.N.Y. 2009) ("[c]ourts . . . have wrestled with how best to balance privacy interests and legitimate law-enforcement concerns in the context of computer searches"); *United States v. Vilar*, 2007 WL 1075041, *35 (S.D.N.Y. 2007) (privacy concerns are magnified with computer evidence because "[c]omputers often contain significant 'intermingling' of relevant documents with 'documents that the government has no probable cause to seize'") (quoting *In re Search of 3817 W. West End, First Floor, Chicago, Ill.*, 321 F. Supp. 2d 953, 958 (N.D. Ill. 2004)). *See also United States v. Upham*, 168 F.3d 532, 535 (1st Cir.) ("[i]t is no easy task to search a well-laden hard drive by going through all of the information it contains, let alone to search through it . . . for information that may have been deleted") (internal quotation omitted), *cert. denied*, 527 U.S. 1011 (1999). For that reason, some courts endorse the use of search protocols. *Compare*, *e.g.*,

*United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989, 1000, 1006 (9th Cir. 2009) (*en banc*) (warrants should include a "protocol for preventing agents involved in the investigation from examining or retaining any data other than that for which probable cause is shown"); *United States v. Cartier*, 543 F.3d 442, 447-48 (8th Cir. 2008) ("there may be times that a search methodology or strategy may be useful or necessary"), *cert. denied*, 129 S. Ct. 1390 (2009); *United States v. Hill*, 459 F.3d 966, 978 (9th Cir. 2006) ("we look favorably upon the inclusion of a search protocol; but its absence is not fatal"), *cert. denied*, 549 U.S. 1299 (2007), *with United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir.) ("it is folly for a search warrant to attempt to structure the mechanics of the search and a warrant imposing such limits would unduly restrict legitimate search objectives"), *cert. denied*, 130 S. Ct. 1028 (2009). A warrant is not invalid without one, however. *See*, *e.g.*, *United States v. Cartier*, 543 F.3d at 448 ("we decline to make a blanket finding that the absence of a search methodology or strategy renders a search warrant invalid per se"); *United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005) ("[t]his court has never required warrants to contain a particularized computer search strategy"), *cert. denied*, 546 U.S. 1222 (2006); *United States v. Roberts*, 2010 WL 234719, *16-17 (E.D. Tenn. 2010) (same) (collecting cases); *United States v. Graziano*, 558 F. Supp. 2d 304, 315-16 (E.D.N.Y. 2008) (Fourth Amendment does not require search warrant to contain "specific methodology explaining how the computers would be searched") (collecting cases); *United States v. Vilar*, 2007 WL 1075041 at *37 ("the view of the vast majority of courts to have considered the question" is that "[w]hile the warrant must state with particularity the materials to be seized from a computer, the warrant need not specify *how* the computers will be searched") (collecting cases) (emphasis in original). *See also United States v. Upham*, 168 F.3d at 537

("[t]he warrant process is primarily concerned with identifying *what* may be searched and seized – not how") (emphasis in original).

Certainly, a direction such as the one at issue in this case serves important and sensible purposes – to limit the intrusion into private matters and information and to limit the duration of any individual's deprivation of his computer property. The first interest is promoted primarily through the requirement that a forensic preview be conducted before undertaking a more thorough examination, while the second interest is promoted primarily through the requirement that the preview be conducted onsite. Despite the importance of these goals, courts also recognize that onsite reviews of computer files are often impractical. *Vilar*, 2007 WL 1075041 at *35 ("often, because of time restraints and insurmountable technical limitations, [computer] searches cannot be carried out at the time the warrant is executed at the premises") (citing *United States v. Hill*, 459 F.3d at 974 ("police were not required to bring with them equipment capable of reading computer storage media and an officer competent to operate it")). *See also Doane v. United States*, 2009 WL 1619642, *10 (S.D.N.Y. 2009) ("where a large number of files contain a mix of documents some of which fit a search warrant's criteria and some of which do not, it is impractical for the executing agents to analyze each document at the site of the search to determine whether it is within the scope of the warrant or not") (citing *United States v. Hargus*, 128 F.3d 1358, 1363 (10th Cir. 1997)). Indeed, the Federal Rules of Criminal Procedure have been amended recently to provide explicitly that a search warrant, unless otherwise specified, authorizes a "later review" of seized electronic storage media, which needs not occur within the time frame specified for executing the warrant. *See* Fed. R. Crim. P. 41(e)(2)(B). As the Advisory Committee Notes to the new rule explain,

> Computers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location. This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.

Fed. R. Crim. P. 41(e)(2)(B) advisory committee's notes. *See Vilar*, 2007 WL 1075041 at *35 ("'it is frequently the case with computers that the normal sequence of 'search' and the selective 'seizure' is turned on its head' as computer hardware is seized from a suspect's premises before its content is known and then searched at a later time") (quoting *In re Search of 3817 W. West End, First Floor, Chicago, Ill.*, 321 F. Supp. 2d at 958)).

Applying the above-referenced authority to the Widner warrant, I find that the failure to conduct an onsite preview of the material seized did not render the warrant itself insufficiently particular or otherwise invalid. The defense contends that "blanket suppression" of all the evidence is nonetheless justified because the warrant was executed in "flagrant disregard" of the warrant's terms. *See United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) ("when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items[, . . .] the drastic remedy of the suppression of *all* evidence is not justified unless those executing the warrant acted in flagrant disregard of the warrant's terms") (internal quotation omitted; emphasis in original); *United States v. Defreitas*, 2010 WL 1223244, *4 (E.D.N.Y. 2010). Government agents act in flagrant disregard of a warrant justifying "wholesale suppression . . . only when (1) they effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (internal citations and quotations omitted), *cert. denied*, 534

U.S. 816 (2001). The first prong of this test requires proof that the search conducted actually resembled a "general search," which has been described as a "wide-ranging exploratory search[]" or an "indiscriminate rummaging," and "ha[s] long been deemed to violate fundamental rights." *Id.* at 140. In the absence of such evidence, the Court need not address whether the agents acted in bad faith in executing the search. *Id*. at 142 (declining to reach issue of whether search was conducted in good faith where first prong of test was not met).

In this case, there is no evidence in the record to suggest that Cass searched for or seized anything other than computer hardware and digital media during the execution of the warrant. Moreover, although a forensic preview was not conducted at the residence, it was later conducted offsite by the same forensic examiner whom Cass had contacted immediately following the warrant's issuance. Under these circumstances, even if the material previewed could be said to fall outside the scope of the warrant, the search can hardly be construed as an "indiscriminate rummaging" resembling a general search. *See United States v. Shi Yan Liu*, 239 F.3d at 141-42 (finding that agents' actions bore "none of the hallmarks of a general search[, but] suggest[ed] a fairly systematic inventory . . . and a search for items enumerated in the warrant; "even assuming *arguendo* that the INS agents exceeded the bounds of the warrant when they seized individual . . . files without first searching them, we hold that appellants have not shown that the agents' search resembled a general search"); *United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 64 (D. Conn. 2002).

The one final question is whether the search team's non-compliance with a court-ordered directive in the warrant itself justifies suppression as a sanction. In my opinion, the Supreme Court's decision in *Hudson v. Michigan*, 547 U.S. 586 (2006), counsels against that result. There, the agents executing a search warrant failed to comply with the Fourth

Amendment's "knock and announce" provision. The Court refused to order suppression, noting that it is a "last resort, not our first impulse" because of its "substantial social costs." *Hudson v. Michigan*, 547 U.S. at 591. The Court reasoned that suppression was too drastic a remedy because the agents would have discovered the incriminating evidence "[w]hether the preliminary misstep had occurred *or not*." *Id.* at 592 (emphasis in original). *Accord United States v. Acosta*, 502 F.3d 54, 58 (2d Cir. 2007) (violation of statutory knock and announce rule does not justify suppression), *cert. denied*, 552 U.S. 1154 (2008). The record here makes clear that the agents would have discovered the child pornography whether the forensic preview had been conducted onsite, as directed, or offsite, as in fact occurred. Thus, the failure to conduct the forensic preview at the residence cannot be considered the "but-for cause of obtaining the evidence," making suppression an inappropriate sanction.[9] *Hudson*, 547 U.S. at 592 ("but-for causality is . . . a necessary . . . condition of suppression"); *Acosta*, 502 F.3d at 58.

For the reasons stated above, I recommend that the district court deny Widner's motion to suppress the evidence seized from his residence.


## II. Suppress Statements

I turn next to Widner's motion to suppress his post-arrest statement. Widner contends that his statement, "Where did they find it?" should be suppressed on the grounds that

---

[9] As the Court noted in *Hudson*, this conclusion does not leave the defendant without any potential redress. For example, if Widner could show that he was damaged as a result of the deprivation of his property during the period between the warrant's execution and its offsite preview, he may have an action under 42 U.S.C. § 1983. *Hudson*, 547 U.S. at 596-98; *see United States v. Acosta*, 502 F.3d at 60 ("[t]he possibility of a *Bivens* claim, as much as a § 1983 claim against a state officer, provides an adequate incentive for federal officers to stay within the bounds of the knock-and-announce rule when executing search warrants"). *See United States v. Matias*, 836 F.2d at 747 ("[a] search must be confined to the terms and limitations of the warrant authorizing it") (citing *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971)).

it was unlawfully elicited through interrogation following his invocation of his Fifth Amendment right to counsel.  For the reasons discussed below, I agree and recommend that the district court grant Widner's motion to suppress.

In *Miranda*, the United States Supreme Court held that the government may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against compulsory self-incrimination and then voluntarily waived that privilege.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  When an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).  *See also Berghuis v. Thompkins*, 130 S. Ct. 2250, 2263-64 (2010) ("[i]f the right to counsel . . . is invoked at any point during questioning, further interrogation must cease"); *Maryland v. Shatzer*, 130 S. Ct. 1213, 1219 (2010) ("if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present").  "Interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

Interrogation includes direct questioning or its "functional equivalent," that is, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. at 301.  *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992).  Law enforcement officers are not to be held "accountable for the unforeseeable results of their words or actions," nor does police conduct "qualify as

17

interrogation simply because it 'struck a responsive chord' in a defendant." *Acosta v. Artuz*, 575 F.3d 177, 189 (2d Cir. 2009) (quoting *Innis*, 446 U.S. at 302-303). "Routine questions, innocent of any investigative purpose, do not pose the dangers *Miranda* was designed to check." *United States v. Thomas*, 961 F. Supp. 43, 45 (W.D.N.Y. 1997) (citing *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989)).

Here, the record plainly establishes that at the time of the challenged statement, Widner was in custody, had been advised of his *Miranda* rights and had unambiguously requested counsel. Thus, the narrow issue is whether Cass was engaged in interrogation when she advised Widner of the charges against him and "followed-up" by asking him if he had any questions.[10] For the reasons set forth below, I conclude that she was.

Ample caselaw supports the conclusion that the recitation of charges that a suspect in custody faces does not amount to interrogation. *See*, *e.g.*, *United States v. Wipf*, 397 F.3d 677, 685 (8th Cir.) (law enforcement officer's explanation to suspect of charges against him did not amount to interrogation), *cert. denied*, 546 U.S. 835 (2005); *United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998) ("law enforcement officer's mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory"); *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995) ("[b]riefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation"), *cert. denied*, 519 U.S. 829 (1996)); *United States v. Payne*, 954 F.2d 199, 202 (4th Cir.) ("the *Innis* definition of interrogation is not so broad as to capture within *Miranda's* reach all declaratory statements by police officers concerning the nature of the

---

[10] On redirect examination, Cass clarified that she "followed [] up" the recitation of charges with the question, "Do you have any questions?" (Tr. 41).

charges against the suspect and all evidence relating to those charges"), *cert. denied*, 503 U.S. 988 (1992). *See also Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009) ("courts have not endorsed the proposition that statements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect constitute interrogation as a matter of law"; collecting cases) (internal quotations omitted).

Had Cass simply advised Widner of the charges he faced, no Fifth Amendment violation would have occurred, even if Widner had responded by asking where the incriminating evidence had been found. The above-cited authority makes clear that under those circumstances, no reasonable officer in Cass's position should be found to have known that a declaratory recitation of the charges would be reasonably likely to elicit an incriminating response. Nor do I believe that the Fifth Amendment would have been violated had Cass simply inquired whether Widner had any questions as they were preparing to depart the station house. *See United States v. Thomas*, 961 F. Supp. at 45 (no violation where question was innocent and free of investigative purposes). The difficult issue presented by the facts here is that Cass "followed up" her recitation of the charges with the direct question, "Do you have any questions?" Under these circumstances, and noting the surprising dearth of authority addressing similar fact patterns, I find that Cass should have known that her follow-up inquiry to Widner would likely be perceived by him as directed to the charges, rather than the post-arrest procedure, and would likely elicit an incriminating response. *Innis*, 446 U.S. at 301 (the definition of "reasonably likely to elicit an incriminating response" "focuses primarily upon the perceptions of the suspect, rather than the intent of the police"). Thus, Cass's stated intent to learn Widner had questions regarding the post-arrest procedure is not paramount to this inquiry. *Id*. at 301, n.7 (intent of police is still "relevant"). Although it is a close question, I recommend that the district court

suppress evidence of Widner's response to Cass's inquiry made after he had invoked the right to counsel.  *See Davis v. United States*, 512 U.S. 452, 458 (1994) ("a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present").

## **CONCLUSION**

For the foregoing reasons, it is my recommendation that Widner's motion to suppress physical evidence be denied and that his motion to suppress his post-arrest statement be granted.  (Docket # 16).

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
August    20   , 2010

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[11]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      August ___20___, 2010

---

[11] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).